May it please the Court, Taras Kick on behalf of Appellant Benjamin Berger. Your Honors, the District Court in this case applied what is believed to be the Consumer Protection Law of Florida and made actual findings adopted from that Florida District Court case, trial-level case called O'Neill. The District Court cites in its order denying class certification 23 separate times the O'Neill Court's opinion from Florida. In our moving papers for the motion for class certification, we cited in-rate tobacco 10 times. In our reply papers, we cited in-rate tobacco 6 times on the motion for class certification. The District Court, while citing the O'Neill case 23 times, cites in-rate tobacco 2, our California Supreme Court's authority on this case and on this issue, a total of 0 times. The Court adopts wholesale the findings from O'Neill as well as the law. And the law in Florida is very different than the law in California. Specifically, the District Court concluded, thus, because the alleged misrepresentations were not relied upon by certain members of the classes, those members suffered no damages and the Court cannot infer reliance or find the alleged misrepresentations were material as to those members. That's at page 18. The Court also found at page 8, only by making reference to individual investigations or testimony could the Court identify the customers who claimed they were not informed or were otherwise unaware that the damage waiver was optional. The Court even adopted the factual findings of O'Neill at page 9 of its class certification order. It said, and I'm quoting, O'Neill conceded the proposed class would contain many customers who knew the damage waiver was optional. So we now have even factual findings made in another case on a different evidentiary record being imported into our California case. Finally, the Court denied certification as follows on page 10 of its order. For the reasons articulated in O'Neill, this Court finds the plaintiff's classes are unassertainable and overly broad. The Court committed error when it did this. The facts of our case are that every Home Depot customer who rents a tool has the tool rental surcharge automatically upon the scanning of the tool at issue. There is a laser gun, scans the skew on the tool, and the surcharge is added automatically at 10%. The wrongful conduct we allege is the auto surcharging of the tool with the 10% surcharge automatically. That this happens automatically is unrebutted at the excerpts of record at 492. It's also unrebutted that Home Depot has sales targets of 95% and comes very close to obtaining them, higher than any other optional or supposedly optional product. The problem with the Court's ruling is that under the unfair competition law, absent class members have no, there is no element of reliance for an absent class member. Was that the only basis for the District Court's denial of certification? I would say yes, Judge Rawlings, in the sense that while the Court denied different elements of Rule 23A, it all flowed from the core misunderstanding that there's no element of reliance by absent class members in California. So when the Court found that there's no ascertainability or typicality, it says it's in its order, that's as a result of you needing to inquire of absent class members whether they relied on those representations. I thought the District Court was somewhat influenced by the fact that some people actually wanted the insurance and were able to benefit, so it would be difficult to weed out those who actually used the insurance or wanted the insurance from those who were given the insurance despite their lack of desire. That's absolutely correct. The District Court, in fact, was very influenced by that and said so in its order, and that's error of law. This Court, the Ninth Circuit, in Stern v. Ticketmaster, itself acknowledged that there would, in a negative option scheme that's not dissimilar to this one, where the allegations were that people, consumers, were unwittingly subscribed to an optional service that they did not want, this Court acknowledged that there would be many class members who, in fact, might have wanted the service, but that goes to reliance, that goes to deception, that goes to damages. And our California Supreme Court, in In Re Tobacco 2, said all three are not an element for absent class members, whether you frame it as reliance, whether you frame it as deception, or whether you frame it as damages, as your question. Does that affect – no, I wasn't talking about damages. I'm thinking about typicality. Well, again, the typicality analysis stems from – Rule 23 cannot import into it an element into a clause of action which doesn't exist. And so, to the extent that the unfair competition law does not have for absent class members the element of reliance, Rule 23 cannot import that into it. You're correct, Your Honor, that the trial judge did, indeed, find no typicality, because how do we know some people didn't want it? Under In Re Tobacco and under 17-200, that doesn't matter. Would you argue it would be the same in regards to the allegation by your opponent that customers were told in some varying forms of this as an option? Yes, Judge O'Neill, it would be identical. It would be error of law for the court under the UCL to engage in an analysis of what absent class members were told. The standard under the UCL is an objective test whether the conduct, which we say is the auto search into the tool, has a capacity to deceive. It's an objective standard. And in turn, this court actually affirmed the district court in its denial of certification on the Electronic Funds Transfer Act actual damages requirement, because it said there reliance is an issue. May I ask you, do you agree that there were different iterations of the agreement that were effective during various stages of the class period? There were. Yes, is the short answer, but the differences are not substantial, especially not when viewed under our unfair competition law. So all of the various iterations of the agreement were generated automatically. So that did not change. Correct. It's undisputed that any customer during any time period when purchasing, renting, I should say, the tool, when it's scanned, the surcharge is added automatically. Now, in 2010, for the first time, our class period starts in 2002, and we propose a subclass alternatively, if I'm unable to convince you on the error of law that really did occur here. We propose a subclass one, which the court also ignored, which was the contract specifically auto-generated for our client. And so at a minimum, even if this court were for some reason to conclude that there was some sort of a reliance element or deception or damages, there's no reason not to certify subclass one on the record. I'd like to reserve five minutes. I have a question for you before you pause. Let me give you a hypothetical. Let's assume that at every store of Home Depot there was a giant sign, you know, 10-foot square at the cash register that said, you're going to get an automatic 10% surcharge for a damage waiver, but this is optional. If you don't want it, tell us. And, you know, let's say that was true in every case. Is it your view that that would be irrelevant to the claims you're making under the UCM? Judge Gould, as the author of the Mazda opinion of this court, I believe that the answer is it would be relevant for the class members, for the class representative, because he has an actual reliance standard post-Proposition 64. It would not be relevant to the certification question. It would then become relevant again on restitution. Home Depot would be allowed to put that forward in a restitution case under 17-203. The trial court has great discretion on restitution. And so they could say, well, it wasn't really deceptive, even though we programmed every single tool gun to automatically add the surcharge, because we had this big sign that said otherwise. They can argue that on restitution, and the judge at trial would then have the discretion to reduce the amount taken. But why wouldn't that be part of the action of Home Depot? Well, because, again, in rereading In Re Tobacco for about the tenth time yesterday, I came across something I hadn't necessarily focused on before. Interestingly, In Re Tobacco cites eight separate times to our California Supreme Court's opinion in Fletcher. In Fletcher, if I could be so presumptuous as to ask this court to read just one more case, if it hasn't already read it, it would be Fletcher. Fletcher is actually what guided Stearns v. Ticketmaster. In Fletcher, what happened was the California Supreme Court, in a case where interest was put forward as 9 percent but calculated on a 360-day year rather than a 365-day year, affirmed denial of certification on the breach of contract case, because everyone had received a truth in lending disclosure and stayed in line in entering the contract was an issue, but it reversed and granted certification on the UCL, saying it's completely not relevant to the cause of action, because it's not an element, what the cause of mine under the UCL was, because it's not actual damages, it's restitution. So Fletcher is really what drove In Re Tobacco too, as well as Stearns v. Ticketmaster. And it relies on another Supreme Court case, Churn, where the actual plaintiff had actual knowledge of the deception, but was still allowed to go forward under 17-200. Did you want to save some time for rebuttal? I do. Thank you, Your Honor. All right. Thank you, counsel. We'll hear from the defendant. Good morning, Your Honors. My name is Stuart Haskins. I'm here for the Appalachian Home Depot. May it please the Court. Good morning. Your Honors, this case could not be certified as a class action, because it's about conduct. It's about conduct, but it's about conduct. It's about the conduct of thousands of different tool rental employees that every day do their jobs at Home Depot. It's about what they said, and if you listen to Mr. King, it's about what they didn't say. It's also about the conduct of literally millions of different California tool rental customers that visit Home Depot and have various needs about what tools they want to purchase, and have various degrees about how to use those tools and what services they need when they rent tools from Home Depot. What's your response to opposing counsel's position that all of those matters that you're discussing come in at the damages phase, perhaps, or the restitution phase, but the pivotal point to certify the class in this case is the automatic generation of an agreement that has the surcharge? I think those are two questions, Your Honor. Okay. If you don't mind, I'd love to break them up for you. Okay. But let me start with the factual issue, because he's wrong on the facts, and he's also wrong about the law. But let's start with the factual issue. Home Depot does not automatically add a damage waiver to every tool rental contract. Well, it appears that at ER 492, in the deposition of a person most knowledgeable, I'm assuming, there was an admission that there was an automatic surcharge added. No, ma'am. The fundamental distinction there is Home Depot's computer in the back office is set up in a certain way. It's set up such that there is a variety of information that is going to need to be populated when you rent a tool. And it's set up such that the damage waiver is set up so that if the customer purchased it, no additional activity by the tool rental associate is needed. Automatic. Automatic. If we want to use that word, that's fine. Okay. But the Home Depot's policy is, before that contract is ever printed, that the associate is supposed to ask the customer a whole bunch of questions. Right? What's your driver's license? How are you going to keep the tool? Right? All of that information has to be loaded in there. And when they print that contract, they want it to reflect exactly the agreement that they discussed with the customer. And that is a dynamic process that occurs every time someone rents a tool. And it's different every time someone rents a tool because that conversation is going to be different. But let's just assume, Your Honor, that that conversation, for whatever reason, didn't take place. Maybe the associate was busy. Maybe this customer has rented 50 tools from him before, so he didn't have that conversation here. We still just have a piece of paper which is just a proposal. That's all it is. It is an offer. And in that offer, Your Honor, it clearly discloses the damage waiver, the amount of the damage waiver, the cost of it, and most importantly, there is a special section on the contract in which the customer is asked, would you like to purchase the damage waiver? It says, I hereby accept the benefits of the damage waiver. And they have to initial that. Now, they could refuse to initial it or, as has happened in the case, in Mr. Berger's case and thousands of other times, the customers accept that offer and thereby they agree to purchase the damage waiver. But that's all it is. Until the contract is signed, until that initial is placed on the contract, it's merely an offer. And Home Depot offering that damage waiver is no different than the local diner in the restaurant and the woman saying, would you like flyers with that, sir? So just so I understand the process, from reading ER 492, I got the impression that the damage waiver would automatically show up on the contract. And if nothing is done, the damage waiver stays there, right? Cost stays there. And so the sales associate has to affirmatively take it off. Is that correct? The process is they should ask the customer. If the customer says, no, I do not want to purchase the damage waiver, the owner is absolutely right. They should take it off. And the version of the contract would be printed out, and that instance would say, I've been offered and I decline the benefits of the damage waiver. Now, again, and this goes to the point that your Honor raised earlier with Mr. Kick, of course, that is the version of the contract that existed when Mr. Berger signed his two rental agreement way back in 2004. That contract has been revised five times. One of those revisions is it actually puts side by side the two options. Do I want the damage waiver? Check, yes. Do I want the damage waiver? Check, no, basically. In other words, you initial next to the option that you elect. Are the customers under that addition of the waiver, are the customers told to choose one or the other? Of course. Affirmatively? And, again, the policy has always been to ask, and here's the reason why. If there are six people standing in line, it's not going to do the customer or the two rental associate any favors if there's anything in the contract that's not consistent with the discussions that they've already taken place. If this Court believes that, going back to the contracts and in the argument by your opponent for a subclass, if you believe that there was an automatic generation of a contract with this so-called optional charge put into the foreign contract, couldn't a subclass be created to deal with that situation? And that's a common question that would involve all of those members. I don't think so, Your Honor. I think for a couple reasons. First, how Home Depot's computer system is set up isn't a material issue in the case. It's not going to advance. I disagree with you on that point. Go ahead. But it's not going to advance the resolution of any claim. But the computer doesn't set itself up. Somebody from Home Depot programs that computer to do whatever it does at the final end, at the end. Of course. And the majority of customers accept the damage waiver. And for purposes of efficiency, it's set up that way. But it doesn't mean that the damage waiver is not disclosed. And that's the critical issue. The issue in this case is whether or not it was. Apparently here, somebody is saying that it wasn't disclosed. I'm sorry, Your Honor? Apparently here, someone is saying it wasn't disclosed. And that would have been a violation of Home Depot's policy. But that wouldn't give rise to a claim, Your Honor, if it wasn't disclosed. If they weren't asked before they were handed that contract, it's still merely an offer. And, in fact, that's what the Missouris- Not if they're charged. If they're unilaterally charged, if the contract is automatically generated without the customer being aware of it, the charge is imposed and the customer is not cognizant of that until the payment is made, that would be a claim. I would agree, Your Honor. And that's not the procedure that Home Depot has set up here. They ask the customer. That's the whole purpose of that. But here's my thought was, what if that didn't actually happen? We have a plaintiff who says, that's what Home Depot says happens, but that's not what happens. And that's the exact situation that the Missouri Supreme Court was just faced with. The plaintiff in that case, Ms. Tchotcharovsky, argued that she wasn't asked before the contract was printed whether or not she wanted the damage waiver. But, just like Ms. Tchotcharovsky, just like Mr. Berger here, she admitted, and Mr. Berger admitted, that he initialed the agreement next to the line that said, I set the benefits to the damage waiver. Well, Missouri law doesn't carry much weight here. So what about California? How would that scenario play out in California? In California, I think it's the same, Your Honor. The question is, did this particular consumer, was he offered the option to decline this service? Absolutely. All he had to do was not initial, yes. He accepted the offer. He was never charged for that damage waiver. He would not have been charged for it if he would not have initialed the contract, accepting it. He signed the contract. He accepted Home Depot's offer, and thereby agreed to purchase the damage waiver. Let me give you another hypothesis. Let's assume in the formation of a cell phone contract by someone buying a cell phone that there's this roundup feature in the contract that says that even if you don't use the cell phone for a complete minute, say 10 seconds, we're going to round it up to the full minute for billing purposes. And let's say that that particular type of language is in some very fine, fine, fine print, maybe on the back of the contract. And someone says, well, look, they didn't tell me about this. They told me to sign here. I signed it. And all of a sudden I'm being billed for full minutes instead of, say, partial minutes. Could a class be built upon that scenario? I don't know, Your Honor. Isn't that what we have here? I think not. I think the distinguishing factor is between – Assuming what you said about being disclosed or not, isn't it a question in that Moxie hypothetical, a question of, well, how effective is that disclosure? Is that valid for us to consider? No, Your Honor. I think there are a couple of key differences between the hypothetical that you just provided and the circumstances that take place in Home Depot stores every day. Number one is we do have a policy of disclosing that the damage waiver is optional, asking the customer if they want it. And that evidence is in the record that that's Home Depot's policy. So what we'd be talking about is an exception to that policy. Now, what you're saying is if we ignore that policy and pretend like those customers were never told and that there's maybe a subset of customers who perhaps weren't told, even in that circumstance I still don't think that you could certify the class against Home Depot because unlike the hypothetical that you just gave, the customers here are given a contract that discloses the amount of the damage waiver, here's the exact cost of it, and right adjacent to that they're asked to sign a signature block that says, I agree to pay for that. That is basic contract law. It's not anything unique about California law, Missouri law. It's not hidden somewhere. It's not hidden at all. The whole purpose of asking the customer to sign the contract in that special terms and condition is to ask if they agree to purchase the damage waiver. And here's the important part, Your Honor, is even if they decline the damage waiver, Home Depot asks them to sign the contract there as well because they want the contract to reflect what the customer has agreed to. It's a contract. It's offer. It's acceptance. Counsel, may I ask you please to address the reliance argument that was made by opposing counsel? Yes, Your Honor, and that was the two-parter that I never got back to. I apologize. Your Honor, as I listened to Mr. Kidd and read through their brief, they spent so much time arguing what they don't have to prove, I think they almost have forgotten what they do. And essentially Mr. Kidd claims that he doesn't have to prove that any other class member was deceived because he's entitled to this presumption of reliance. Well, his argument is that the district court erred in ruling that absent class members had to prove reliance. The only plaintiff, only the lead plaintiff had to prove reliance. Exactly. But I think if you look at the record in this case, what the plaintiff is really asking this court to do is create a presumption of conduct. They are trying to presume what customers were told, what they were not told, what they knew, what they read in the contract, what they saw. Did they see the sign? Well, but would you respond to the discrete point as to whether or not there has to be a showing for class certification that the absent class members were relied on the conduct? Yes, Your Honor. I believe they do. And whether it's... Why? What case says that? I believe this court's case in Mazda says that. I believe that Davis Miller says that. I believe that the... It says that absent class members have to have relied on the conduct that the representative plaintiff is alleging. I believe that what they have to show, Your Honor, to be entitled to the presumption of reliance that Tobacco II sets forth. What it says is those class members are going to be entitled to a presumption of reliance and they're not going to have to have individualized proof of reliance, deception, or materiality, right? And again, we're talking about reliance here. It's really deception. I mean, their claim in this case is that the customers were deceived and they didn't know that the damage waiver was optional. But the key point is that all of the cases, both before and after Tobacco II, have consistently held that the plaintiffs in the case, the absent class members, had to be exposed to the alleged deceptive conduct. Whatever it is that the plaintiff contends with the alleged wrongdoing here, they have to have been exposed to that. There has to be a uniform course of conduct. And that's what plaintiff is asserting. That the automatic inclusion of the damage waiver without adequate explanation is the harmful conduct, the deceptive conduct, and that if Home Depot wants to challenge that, that can be done outside the class certification process and in the context of discovery and further proceeding. But the problem with that, Your Honor, is that Tobacco II is a standing case. What that says is here's the standing. We're not going to have to have individualized proof of reliance for each of those absent class members, but it doesn't eliminate that commonality element. So what should the plaintiffs have done, in your view, to meet the standing requirements set forth in Tobacco II? How could that have been done outside the allegations that were made by the representative plaintiffs? Your Honor, I see that my time is up. I don't think that the way that the Home Depot tool rental process works, given the nature of that transaction, which is as diverse and unique as the individuals who participate in it, there is no way that you could ever say that there was a common course of conduct about what people were told, what they asked, what they saw, what they understood when they rented the tool from Home Depot. So it would be impossible for them to ever certify a class on this record. However, if Home Depot had wanted to engage in a deceptive scheme to try to trick people into purchasing the damage waiver, I submit to you, Your Honor, they did a really bad job of it. They posted signs, they asked customers to initial the contract indicating that they agreed to purchase the damage waiver, and they trained and told their employees to ask and tell the customers that the damage waiver was an option. And at the end of the day, Your Honor, all they're doing is offering a product. They're just selling a service. There's nothing unfair and improper about that. Any other questions from the panel? Thank you, counsel. No questions. Thank you. Rebuttal. Thank you, Your Honors. I'll try to go very quickly, but there were a number of statements that need addressing. First of all, a common misunderstanding or a frequent misunderstanding, it's not a presumption of reliance for absent class members under the UCL. It's a lack of an element of reliance. That's the difference. Stearns knows that difference. Mazza knows the difference. Ingrid DeBacco talks about it. Fletcher talks about it. Chern talks about it. There's no element of reliance for absent class members. Well, opposing counsel says it's not really reliance you're talking about. You're talking about deception. What's your response to that observation? Your Honor, he is saying that. And, in fact, in page 24 of their appellee's opposing brief, they even go so far as to say we didn't argue reliance or the court didn't find absence of reliance. The court found absence of deception. But Ingrid DeBacco, too, says there's no element of deception, damages, or reliance under the UCL for absent class members. It's a difference with no distinction for purposes of our California Consumer Protection Law. All three are addressed. So let me ask you, what is the reliance, deception, or fraud, however you want to phrase it, that you are asserting on behalf of the representative plaintiff? What we're asserting, Your Honor, is the fact that in every store, every point of sale across the state, the tool rental system was set up so that if you scan the tool, it's automatically surcharged with the 10%. It requires affirmative action to then remove it. Just so I understand your position, does it make a difference to your claim if, as counsel represents, before the contract is ever generated, there is a discussion between the sales associate and the customer to determine how the agreement will be printed? Does that make a difference? I'd like to make two points in answering that question. The answer is it makes a difference in the restitution phase with which the court will have discretion. Maybe some court can even be convinced that the law is gray enough that on summary judgment, they can put on that no reasonable standard would allow deception in this case. But importantly, MAZA adopted an actual exposure test. Our California appellate courts post-in-rate tobacco 2, 3 have sort of said you need to have the absent class members exposed and 3 have said you don't. And MAZA said, well, we need the exposure. But MAZA never said there's no presumption of reliance, deception, or damages on behalf of absent class members. Very important to understand. What Home Depot is proposing that you do to our California laws is an absolutely radical departure from the most conservative appellate courts post-in-rate tobacco 2. They're now asking you to implement an additional requirement that no court has done, which is not just require actual exposure to the conduct alleged to be deceptive, but then also have each class member prove that they weren't exposed to some sort of supposed curative disclosures. That would kill the UCL. It's impossible to prove that absent class members weren't exposed to curative disclosures. That's for restitution. And I want to, in the little time I have left. Yes. I want to ask you a question. I apologize to my colleagues for taking you over your time, which has already been used up, but maybe you could just hit the nail on the head on. You say there's an automatic charge and it's going to stay there unless something affirmative is done, meaning like the sales clerk has to take it out of the contract. But where does it fit that your client had to initial to accept it? Because counsel for Home Depot say if there hadn't been an acceptance of the charge by initialing it, then it would not have been charged. Okay. That actually segues into the evidence I wanted to talk to and the subclass in finishing. We already had the benefit of a court actually looking at this very contract, the subclass one contract, which was what our class member used. That's Judge Guilford before the case was transferred to Judge Otero. Home Depot invited him to look at the contract and argued it discloses that the charge is optional and Judge Guilford said defendant argues the plaintiff's allegation that defendant concealed the optional nature of the damage waiver is plainly contradicted by the rental agreement. The court disagrees. So a district court judge itself has said that what Home Depot is arguing today is not correct. Importantly, counsel was very careful in making his argument not to say that there was evidence that these disclosures were made as well, but rather to say it's their policy to disclose. We conducted a mystery shopper survey of 50 different Home Depot stores all in California. Not a single time was a disclosure made as Home Depot states it was, and 88% of the time it was never disclosed before the transaction had occurred. That's unrebutted. We have a consumer expert that was put into evidence, Mr. Bloomberg, says no other retailer does it like this. Thank you. Thank you, counsel. Thank you, Your Honor, for your time and consideration. Thank you to both counsel. No apologies needed, Judge Gould. The case just argued is submitted for decision by the court. The final case on the calendar for argument today is United States v. Rodriguez et al. So, as counsel are coming forward, I understand there are two attorneys for the defendants who will be arguing and that you'll be spending your time. Welcome back. I'm just here, Your Honor. Judge Gould, Judge Lomel.  We've asked the clerk to set my time for 12 minutes, and during this time I'm going to try to address the first two issues in our briefs, focusing on the causation issue. And then Ms. Vifal will argue the gradient of fluidity, giggly old part of the case, which is going to take eight minutes, and then our colleague, Mr. Rafael, will speak along for the government. All right. Thank you, Your Honors. It's good to see you again. Again, my name is Ethan Battle. I represent Alejandro Mojica, and this morning I will be speaking on behalf of all appellants, including Jose Murillo and Oscar Rodriguez. This case occurred at Victorville Prison. Five days after being involved in a prison brawl, Peter Scapazzi went brain dead in a hospital, Arrowhead Hospital. He was removed from life support, and he died. This brain death was not the result of the wound he received in the brawl. Rather, the day after Mr. Scapazzi was brought to an intervening hospital at Victor Valley, he received medical treatment, and when he was left alone, he pulled a breathing tube out of his mouth. This was an unforeseeable, irrational, we would suggest deranged act. When Mr. Scapazzi pulled the breathing tube out of his mouth, he had a sudden loss of blood, leading to a cardiac arrest. His heart stopped for 12 full minutes before he was resuscitated. The medical staff at Victor Valley realized he needed further treatment. They medevaced him to Arrowhead Hospital, where he suffered another cardiac arrest. His brain swelled during this time because of the loss of blood. When his brain swelled without any relief from the brain, the edema of his brain broke, and that caused brain death. The doctors ordered him removed from life support, and he expired. This is what caused his death. It was etiologically unrelated to the puncture wounds in his chest. But the jury that determined that these appellants were the proximate cause of his death, as required to find that beyond a reasonable doubt, were never apprised of these facts. And they weren't apprised of it because the district judge excluded the evidence at the government's request. And this was error. The government agrees that they were required to prove beyond a reasonable doubt that these appellants, and the only person that stabbed Mr. Scapazzi was Jose Murillo, that Mr. Murillo was the proximate cause of his death. In this case, we say it's controlled by a case called United States v. Maine. The panel was Noonan, Thompson, and Kleinfeld, highly respected judges of this court. And they say that the cause of death, proximate cause, is a fact question for a jury. They found it's a fact question a jury is peculiarly qualified to answer. And we contend and appeal that the district court's exclusion of the evidence of Scapazzi's irrational response to treatment was something the jury had to consider. We know that Mr. Scapazzi fought with the first responders. We know he pulled out his breathing tube. We know that he had the cardiac arrest that led to the swelling. We also knew that prior to the time that Scapazzi took these acts, the wounds that he had received from Mr. Murillo were healing. They had been treated, and they were not the cause of any blood loss. They were not the cause of any brain swelling. Wasn't that contradicted by the government's expert? No, actually, it was not contradicted at all, Your Honor. And I thank you for that point. What Dr. Holt, who was a medical examiner, testified to was that he died, Mr. Scapazzi died, from a sequelae of puncture wounds to the torso. And that's the exact point we make. You would think, oh, that means he died from the puncture wounds. But sequelae means secondary results, and as was proffered by the defense counsel, and as was blocked on cross-examination, when Mr. and the medical, excuse me, as far as the medical record, he definitely died from brain leprosy. These are true facts, and I don't think my opponent will dispute them. When on cross-examination, they said, Dr. Holt, you said sequelae to the torso. You said complications. Can you please tell the jury what you mean by that? The judge blocked the inquiry at the government's request. When they said, well, Dr. Holt, when you said complications, don't you mean he died from brain death? Objection. No grounds. Objection. Sustained. Move on, counsel. And this is ER 19-22, or ER 18-22. So, counsel, what case authority should we look to, if we were writing an opinion, that would support your argument? What case would support our ruling that if there is medical negligence following a gunshot wound or a stab wound, that medical negligence relieves the perpetrator of criminal liability? Point us to the case that we would cite that would help us to explain that ruling. I'm going to give you three questions, three cases, Your Honor, but I may kind of respectfully change the focus of your question. I don't want to give you three cases that say medical negligence is enough, because I don't have those cases. So I'm going to give you the cases that say proximate cause is a fact question, and here's why, and the cases that say we were entitled to introduce this evidence, that we were not the proximate cause, because there was an intervening cause, the standard is. That's very general, but specifically, the question I'm posing is, because that's the scenario that you're painting for us, is that it's the complications that arose in the medical setting were the cause of death as opposed to the stab. So I'm asking you to give us a case that we could cite. If we were to write an opinion that would support not the general proposition of proximate cause, because – I'll give you two. Okay. I'll give you Maine, because Maine is the example where the gentleman is driving a car, and they get stopped by some tribal police, and when they go to arrest the driver, his passenger jumps in the driver's seat with the other passenger, and they take off. And he has an accident, and the passenger gets pinned, and the passenger dies from asphyxiation. And the question in that case was should the jury have been allowed to consider whether the driver was the cause of death. And the district judge said no, and Judge Noonan, Kleinfeld, and Thompson said no, no, no, of course the jury. It's a jury decision. And they gave an example. They said – and the standard they said is was the cause of death reasonably foreseeable? Right. Was the downshifting reasonably foreseeable? In this case, they said maybe it was. It could have been that he would have an accident if he drove twice the legal limit, if he had a blood alcohol three times the legal limit. A jury could find that, absolutely. But this jury wasn't permitted to find that element, so that's error that requires reversal, because the district judge took it away by not instructing him. The judge let the evidence in, but didn't let them instruct him. And maybe it was a bear. If a bear came in, would that be enough? Do you agree, though, that your argument would only apply to the murder convictions and not to the conspiracy? No, I don't. But can I just give her two more cases, Your Honor, before I answer your question? The second case I'd give you is the Brackett case out of the Seventh Circuit, which addressed a very similar case situation on a sufficiency Jackson challenge. We talked about Jackson on Monday. And what happened in Brackett is a man, a young teen, or a young man in his 20s, a raped and beaten elderly woman who was afterwards treated. She went to a nursing home, and weeks later, she was in a debilitated state. Because of the injury she suffered, she couldn't eat. When a nurse was feeding her, food lodged her trachea, and she died from asphyxiation. And then the Seventh Circuit said a jury could find that that was reasonably foreseeable, but only because the jury heard all the evidence. And the jury was able to consider, was that downstream event of treatment and injury to the neck and asphyxiation, was that reasonably foreseeable? But the evidence came in. So I'd give you Brackett. And the third case I'd give you is Stiver, which talks about, and even built on an Evans-Jeff say, and I know Judge Gould had objected to the quality of the evidence that was emitted or was excluded in Evans and now reversed. But the standard is the same, and the standard is, if a district court excludes evidence that's critical to an element the government has proved, that's constitutional error. But back to your question. Is that S-T-E-V-E-R? Yes, Your Honor. That's the Mexican TDO case. That's Judge Burr's own opinion that's been built on since then, including Evans-Jeff's. Okay. The question that you had, Judge Lamont, no, I disagree that it doesn't relate to the conspiracy case, and I think we laid it out a bit in our brief. The death was the key to the conviction on both counts, and the government argued, remember, that there was not only a conspiracy to kill Scopazzi, there was a conspiracy to kill Altsch, there was a conspiracy to kill Rondo. And the big delta in the arguments and the jury's finding was they only sustained the conspiracy to murder for the man who died. And though my client, and just to be clear, my client didn't argue self-defense because he didn't testify. His only defense, Mr. Rodriguez, was his cause of death defense. Granted, Murillo and Rodriguez argued self-defense, but they would debilitate to argue the secondary defense. But on the conspiracy one, the jury made that distinction, and Mr. Rafael and Mr. Lokia's trial argued, well, no, they definitely intended to kill Altsch because they could have had his vital organs. They could have. They made the argument that the stab wounds were important to determine intent, and the jury rejected that. So by their split verdict, I think they made a difference, that death mattered. The limited injuries that we pointed out, they were all treatable. They were treated and healed. They didn't cause his death. But a jury, if they had this evidence, might have concluded that they didn't intend to. The notion that the jury could have compartmentalized Scopazzi's death outside of the conspiracy to kill him, we think that's a bridge too far. Before saving what I can for a butler, I'd like to briefly address the Mexican mafia evidence. Kennedy versus Lokia, this court, the teaching is that gang evidence is almost always reversible error unless it's directly tied to the case. In this case, the government's theory was that if Scopazzi was drunk and called Murillo a bitch, that raised tensions. Our defense theory, and the defense has to know, when he opened his cell door and said, I could have caught you slipping and then play fought, that rose tensions. But it was personal between Yogi, Mr. Murillo, and Big Dave. It wasn't about gangs. And so the evidence of the Mexican mafia was sprinkled in to tie them to the Mexican mafia. How do you explain the kite? Talking about, you know, they represented well and... I think that's fantastic. I'll close on that. The kite comes after the government's theory. The government's theory says, because of whether it's a bitch or the room, whatever, that before anyone goes into 204, this conspiracy is set. They talk about the meeting at the cell and obviously they were rejected when they acquitted Menendez and Martinez, so there was two full acquittals. But what the kite says, and we take the kite at face value, is the violence erupted when he said, fuck you Southsiders in the South. Part of my profanity. Is there a record? Not in our briefs. And that's when it erupted. And that is the same as... So it's after conspiracy. It's not part of their theory because it happened in the cell. And we would say it's the equivalent of any altercation. If outside, you know, God forbid me and Tony had a... And I said, wait a minute, like, F-U-U-F-N-F, or, you know, I can't believe you convicted my guy, and I got on his grill and he responded to it. That's not gang-related. In any case, it's irrelevant to the theory because the theory of the case is, way before I came into that cell and met Tony, hours before I said that to him, that's when the beef can happen. So the type proves that the conspiracy couldn't have happened beforehand. It's not consistent with their theory. It was irrelevant under their theory. And the last point I'd make is, under their theory, even a low-class serenio who has no connection to the Mexican Mafia, the Mexican Mafia evidence would come in because if you're a low-status serenio, you want to become a high-status serenio. You're in prison. And the best way to become a high-status serenio is to murder someone, according to government. So just, it wipes out any basis for it. There's no distinction there. It's just guilt by association. I thank you for your time. I'd ask for a little bit of rebuttal. We'll give you a minute for rebuttal. Thank you, counsel. All right. Good morning. Bernal, we followed on behalf of Oscar Rodriguez. I would like to address the Brady issue regarding the Rule 35 motion that was filed by the government on behalf of the make-or-break witness, Ryan Davis. Ryan Davis is the only witness who supported the government's theory and testified as to what happened inside of that cell, that it was not self-defense or a drunken prison site, so to speak, but, in fact, that the defendants came in there armed and ready to kill. That was Davis's testimony. It was disclosed that Ryan Davis had not been given any promises in regard to his testimony. It was disclosed that he was an armed career criminal and he had gotten 10 years in his case in Oregon, for which he cooperated, and that's why he got 10 years. But, basically, that was it. Ryan Davis was asked by criminal defense attorneys, the trial attorneys, over and over again, you were aware that the government could reduce your sentence afterwards. He said, yes, but I don't know that that's going to happen in this case. I wasn't given any promises. And the government, this, Ryan Davis never, never conceded that he hoped that he would get any kind of a benefit or reduced sentence as a result of his cooperation. And, in fact, he said and insisted that his motivation for coming forward out of great risk to his personal safety was that these guys killed Mr. Scapazzi and that if no one cooperates, they'll get away with it, and that's why I'm here. But what, in fact, happened, oh, one more thing that's important. In closing argument, the government's rebuttal argument said, you know, there's been some suggestion that Ryan Davis is testifying because he's looking for a deal. But he testified, and there's no dispute, that his release date is January 2001, and this is July 2008 that that's been said. He has more than two years left to go. Repeatedly said he's getting out January 2011. The jury verdict came down on the 25th of July 2008. Excuse me, yes, the 25th, and that very day, before the court is even completely recessed, the government calls up the Oregon prosecutors and begins the process of seeking a Rule 35 motion. It is filed for a time-served sentence, it's granted, and Ryan Davis was released from custody on the 23rd of October 2008 before the defendants were even sentenced, and that was never disclosed. We learned for the first time that there was, in fact, a Rule 35 motion for a time-served sentence in December of 2011 when we litigated the limited remand for the Rule 33. Now, why is that a Brady violation? I mean, we need to show that it's impeaching. We need to show that it was suppressed by the government, and we need to show that it's material. I don't think the government's going to dispute that it was impeaching. If the jury had heard that Ryan Davis was going to get a Rule 35 motion for a time-served sentence after he testified, I think that that would be a very big deal. The government disputes that this was suppressed because it wasn't a promise. Well, all I can say is it walks like a duck, it talks like a duck, it's a duck. But the issue is, was it an undisclosed promise? For it to be Brady, there would have to be a promise that was made that was undisclosed. So what's the evidence in the record that a promise had been made that was undisclosed? Because that was thoroughly explored during cross-examination, right? Well, I think this is what I would say to that. It clearly was a tacit understanding between Ryan Davis and the prosecution. Because we have to – and there are numerous cases in this circuit regarding winking and nodding, failing to disclose, tacit deals. But let's look at this. We have Ryan Davis as a veteran informant. He has already cooperated. He assists – and in fact, even in his testimony, he said, well, I got 10 years and I cooperated, but it sounds like he's just spilling the beans on himself. He goes, I don't know, the judge came up with the 10 years, and I got three points off for acceptance of responsibility. He's not really even conceding that, you know, getting deals and that kind of thing like that is a motivation for anybody to do anything. He's a criminal. We have the – he has a long-time lawyer, the snitch lawyer from Oregon, who's talking – well, the government didn't make any promises. The government doesn't have to make any promises. We need to have this game in play. And there are numerous cases in this circuit where we're talking about these vague, undisclosed, you know, winking and nodding. We have Ryan Davis who's like, I mean, I can just picture this. We don't have to say, you know, the government, the FBI agents, the DEA agents are sitting down and saying, well, you know, we can't promise you anything. Oh, I know, but I just want to see justice for Mr. Scapacci. And, you know, we really can't promise you anything. Oh, I understand that. But then immediately, immediately after the jury has been told, well, this guy's not testifying for a deal, immediately after he testifies that I'm here to seek justice, they move to get him out of prison, and he's out of prison two and a half years ahead of schedule, 20 percent reduction of the sentence, and before the defendants are even sentenced. What's going on here? Aren't you asking us to make a big leap of faith that the government had intended at the time of trial that it was definitely going to seek this type of relief and that somehow that was not, you know, really informed their intent? It happened afterwards. But isn't that typically the case anyway? The government may say subjectively that, you know, we're going to do this if this guy testifies in accordance with what he's told us before in debriefings with our agents. And then he testifies, is consistent with the debriefing, and then later they say, okay, we're going to go ahead and file a motion to reduce, or in our situation in the federal system, you know, Rule 35. It seems to me as if you're attacking the very fact that it did, with the deal that was disclosed, authorize him to do it. I disagree. And you're asking to get into subjective intent of the government. I know you say objective fact. It's about the timing of the Rule 35, but I'm just wondering if that's really a subjective argument you're making. I disagree that this was part of the deal that was disclosed, and I'll tell you why. Because the prosecutor said in his rebuttal argument in response to the defense attorney's attempt to try to make it look like Ryan Davis was testifying for a deal, he specifically said that's not the case. They're trying to make it look like he is testifying for a deal. And it's not disputed, ladies and gentlemen, he's getting out in January of 2011, and then the prosecutor goes into, and in fact he came in here because he said if I don't cooperate, they're going to get away with it. So the jury is affirmatively misled about this man's motivation for testifying. And the Ninth Circuit, there are numerous cases. We have Will Hoyt v. Vasquez, in which Judge Trott says in his concurring opinion, if we sanction these kinds of winking and nodding, this tacit understanding, or in that case where the prosecutor says to the defense attorney, don't worry about anything. Just don't tell him anything. That kind of thing like that. And Judge Trott said, you know, our system of justice sanctions deals between prosecutors and defendants and so on. And he goes, on whom do we rely to keep the system honest? But we have, in that case there was concrete evidence that there was a secret agreement and also an agreement not to disclose the secret agreement. So we had concrete evidence in that case that there had been a tacit agreement to reduce the sentence. But we don't have anything like that here. But we do have, there is a Ninth Circuit case, Randolph v. the State of California, in which I cited that in my brief, in which this court remanded it for a hearing because, even though, again, no promises, the problem is that if you look at what happened to the informant's case afterwards, the government made numerous appearances on his behalf. I should say it was the state attorney general made numerous appearances on his behalf. And, in fact, you did get all these benefits. We have, we also have Hayes v. Brown. We have. But there are no numerous benefits in this particular case. It's just his sentence was reduced. I think that that's probably the most important benefit for this guy. This guy is a veteran informant. He is a drug addict. And he can't wait to get out of prison. For any of these guys, I mean, the goldmine of benefits for informants like that is a time-served sentence. Think about, and if it wasn't, let's look at it in reverse. If it's not a promise, if it's not a winking and nodding, if it's not a tacit understanding, if it's not a deal to this guy, why didn't the prosecution, they often have vague deals like this. This is very common in federal court. We can't promise anything. But we will tell the judge that you cooperated. And, you know, it's up to the judge to do what the judge wants to do with that. We're not going to, you know, make any deals saying you will get out or you won't get out. But we'll tell the judge. But that's when a sentencing is pending. That's not this case. I'm sorry? That's when a sentence is pending. That's not this case. That is correct. But it's still, because here, this guy is asked over and over again. They could move to reduce your sentence. So the jury's heard, well, they could do that, but then the prosecutor is denying that that's really going to happen, and this guy is motivated to testify because he wants to seek justice. How do you think the jury is going to, what do you think a jury would say? Well, you've exceeded your time. So thank you very much. We understand your point. Thank you. We'll hear from the government. Please be seated. May it please the Court, good morning, Your Honors. Tony Raphael on behalf of the United States. The defendants in this case conspired to kill the victim, David Fisher. Jose Murillo stabbed the victim five times. Two of the stabbed ones. One was an eight-millimeter-deep stab wound that punctured the victim's right lung. Another stab wound was 12 centimeters long that punctured the victim's right lobe of his liver, went back to his intestines. I'd like to go back. First, I'd like to address the negligence, the medical negligence issue. And I think it's important to look and see what the defendant asked Judge Phillips to do, pretrial. And the pretrial motions in this case are attached at the GER 1823 to 1875. So the defendants in this case filed, the government filed a motion to exclude evidence of medical negligence. They also exclude their expert. And Judge Phillips issued a written order, and that's at ER 51 and 52 and ER 59, the relevant portions. And I'd like, even though this is not very elegant, Your Honors, I want to take just a small minute to read what Judge Phillips wrote, because it's very important. She said, the Ninth Circuit has not addressed the issue of intervening medical negligence as a defense to murder. Other circuits have confronted the question, however, and in general have held that intervening medical negligence is not a defense to the charge of murder. She cites to the Rodriguez case and a couple of the other cases, the Peters case and the Gillette case. Rodriguez case is from the Eleventh Circuit. She goes on to say, the Eleventh Circuit has held that gross medical negligence, however, can be a defense to murder if such gross negligence is the sole cause of the victim's death, citing Rodriguez. And she goes on to talk about what the defendants are asking for. So she talks about Jose Murillo had filed the main motion there or the opposition to the government shown by other parties. And Judge Phillips wrote, defendant Murillo seems to concede this is the correct standard with regard to sole cause of death. So they conceded that, that in order to be a defense to murder, whatever the negligence is, has to be the sole cause of death. And then she goes on to say that, defendant Murillo, as he argues, that evidence of gross medical negligence is relevant to the cause of death and the issue of intent to kill. So they argue it's either relevant to cause of death or intent to kill in the beginning. Judge Phillips goes on to conclude that in this case, because the defendant, through their expert, Dr. Morgan, who was the Chief of Emergency Medicine at UCLA, had not proffered any evidence that any intervening negligence, any negligence, any other acts, was the sole cause of death. She's not going to allow medical negligence to be introduced. However, she will allow Dr. Morgan to testify, and this is at page 59, line 59, concerning the intent of the defendant, not specifically the intent, but let me read that. Doesn't your argument all go to whether or not, this whole issue goes to whether or not that's a fact question for the jury to decide as opposed to a legal question? What standard did you use? And they can instruct the jury along the lines of what you just said, saying that you have to find gross negligence was a sole cause that led to the death in order to say that there was no liability for the murder. But it seems as if your opponent is arguing that that may be the correct standard, but that's a fact issue for the jury, not the judge. That's correct, Your Honor. But when the defendants did a trial, they didn't ask for that. They didn't proffer evidence. The only thing they asked for is to proffer evidence, and I'm going to read what happened at trial. I'm going to cite what happened at trial. So Judge Phillips allowed them to introduce evidence, Dr. Morgan's opinion, with regard to the wounds, the degree of force used to cause them, as such testimony is relevant to the intent of the defendants.  So what did they tell Judge Phillips at trial? This is after the medical examiner had testified. They didn't go back to say, Your Honor, we want to introduce evidence of medical negligence because it's a defense to murder. It's foreseeability. We want to show that. The only thing they said, and this is at a sidebar, and this is at GER, starting at 737, 738, and this is Mr. Klein, one of the defense counsels for Mr. Murillo. He states, I wanted to do this earlier, and he goes on. The state of the evidence with this witness, talking about, I believe, the medical examiner, is that we have five puncture wounds that are nonfatal. Each one of them, and all of the jury knows, is that there is something happened and some complications after that resulted in the death of this person. And then he goes on. The jury is going to have to make a determination of the intent of whoever it is that stabbed Mr. Scapazzi, and they are now left with the impression that these puncture wounds are fatal, and they're not. Again, they only focused on the intent of the defendants. Judge Phillips had ruled, and she told them here, I'd already ruled on that. Bring your expert. Put in your expert, the chief of emergency medicine at UCLA. Let him testify about that. They never did. And the medical examiner in this case, his testimony was limited. He testified about the five puncture wounds. He testified about the organs that they hit. And he said that the victim died from secondary or secular complications, or secondary complications of those injuries. We never, the medical examiner never got into fully... Didn't that open the door then for impeachment and cross-examination? And what do you mean, doctor, by these things? I mean, a juror out there, I imagine, may not know these medical terms, but doesn't it raise an unanswered question there that perhaps the other side, just out of simple fundamental fairness? Your Honor, again, there was no proffer from the defendants that filed with those complications. How is that going to be the sole cause of death that would cut off their liability? But you have a witness here that could explain that, who opened the door by saying that. Again, Your Honor... In my opinion, at least, perhaps. I guess what I would say, respectfully, Your Honor, is that the witness did not open the door. And there's another part for another sort of outside the jury discussion. I think this is... Let me just make sure I have that. This is at PR-448, and then there's another section, also, Your Honor, with another witness, the witness at GR-70A. The government, from the beginning, told the court that it was going to limit its direct examination of the medical examiner. We're not going to get into all the details of how he was transferred. He became brain-dead. They took him off life support. And we stuck to that. All that the medical examiner testified is that there were some complications from these stab wounds. There was no proffer, a sidebar, anywhere else from the defense that somehow there was an intervening cause that would cut off their liability. The only thing that they argued was this is important to talk about the intent of the defendant. But they never said how it's going to be the intent. The only thing they brought up with regard to intent pretrial was the expert testimony of Dr. Morgan. And they never put that in their case in chief. They never put on any testimony with regard to the force that was used or the type of force that was used, even though Judge Phillips had allowed him to do that. Was there evidence that the victim here actually removed the feeding tube?  No, Your Honor. But in the autopsy report, which was not introduced at trial, was not introduced for any testimony in the autopsy report, there was. He did remove his feeding tube. But again, Your Honor, I submit in this case. But that didn't come out at the trial. This did not come out at trial. Again, the only thing that came out at trial was stabbed, the depth of the injuries, the organs they hit, and that he died as a result of secondary complications. Well, was it because of the district court's ruling that that evidence didn't come out at trial? If the district court had allowed the evidence of medical negligence, then the feeding tube evidence would have come out at trial, most likely. That's correct, Your Honor. Again, but the defendant never argued that this was, that would have been a sole cause of death, as the district court had ruled should be the standard. Again, in its written order on ER 52 and 53, that's the position that the defendants took in their own papers. So your argument is that once the evidence came in, the defense could have proffered what evidence they would have admitted and perhaps convinced the judge to rethink her position? Is that your? That's correct, Your Honor. The defendant agreed that for medical negligence to come in, it had to be the sole cause of death. But they never came forward with any evidence through their own experts or through what the medical examiner would say, that, hey, this witness is going to say that the medical negligence or pulling out the tube is the sole cause of death. As Judge LaMalle intimated, they could have said, the door's been opened now for us to put in other evidence about what the cause of death was, and so here's our evidence. And the district court judge could have admitted it or not, and we would have had a record as to what the evidence would have been. That's correct, Your Honor. But they only asked to admit evidence with regard to the intent. They never argued as at the final sidebar, where they're sort of summarizing the state of the evidence. They're saying, look, this is what the jury is left with. We don't have any evidence to talk about intent. And Judge Phillips responded, I already ruled on that at the pretrial motion. And that's the reason, I mean, I can see as a practical matter why the defense wouldn't have kept insisting on that, because the district court judge had already said, this evidence cannot be admitted. So the defense was in a little bit of a bad place, because you don't want to antagonize the judge by insisting on admitting evidence that the judge has already said can't come in. Two things, Your Honor, if I may. One, let's be clear. Those stab wounds were, there's no evidence that they were not fatal. They punctured the victim's lung, they punctured his liver. Twelve centimeters going through his body, through his right lobe, into his liver, through his intestines, that came in. Puncturing the lungs, those are not small injuries. Those are not the kind of injuries you sort of, you know, it's not like scratching somebody's toes and the doctor gives them an infection, or the doctor infects them with some kind of a virus. But the record reflects they were not immediately fatal. That's correct, Your Honor. But again, you know, again, he was bleeding internally, he was stabbed, he had a punctured lung, he had the liver was punctured, the right lobe. Again, no small injuries. And those are the injuries as the complications from those injuries. If I can ask you a question, please. Did the defendants ever proffer evidence to the court that the act of the decedent in removing the tube in his mouth was a supervening cause of the death? Here's what they said, Your Honor, and it was never proffered as evidence. It was simply, they asked the district court, and let me find, this is at ER 448. Again, it's Mr. Klein. And here's what he's saying. These are the complications that flowed from the stabbing of Mr. Scapazzi that I would elicit from the coroner. Mr. Scapazzi was first taken to Victor Valley Hospital. In the course of his treatment there, he was put on a breathing tube. While he was there, he pulled the breathing tube out, and he also had a sudden loss of blood. The combination of pulling the breathing tube out and the sudden loss of blood caused a cardiac arrest. In other words, his heart stopped, and it stopped for 12 minutes. So that's a proffer. That's correct, Your Honor, but again, this proffer is also based on what the stab wounds caused in this case. You know, they never- Yeah, but I'll let you know what's bothering me, and I'll let you address it. It's a normal medical negligence. You know, let's say there's stab wounds or bullet wounds from an assault, and then the doctor's hand is in surgery. There's a doctor whose hand splits. And so there's routine medical negligence. So I can see why that wouldn't be- or why courts might not want to get into that in every murder case or assault case and would not permit that. But where a decedent makes some volitional act, like, you know, pulling the tube out of his mouth, I'm not quite sure that shouldn't come in. I don't know if the record here is sufficient, whether the defendants really, you know, made a proper proffer on that. But maybe that the language you read is sufficient for that. So I'm sort of wondering why the court shouldn't let that type of evidence in and then let the jury decide under the quite rigorous standard that everyone agrees on. I guess, Your Honor, it's going back to what the position of the defendants took early on in their papers as cited by Judge Phillips. They agreed with Judge Phillips in their papers that in order to be a defense to murder, it has to be the sole cause of death. In other words, they would have to have a witness say the reason why he died is because he pulled his tube out, not because he was stabbed. Doesn't the question really go to foreseeability and that distinguishes between a simple act of negligence and something like this where the victim's hand may have been the cause of death? Isn't that a foreseeability question? It may be, Your Honor, and it is a foreseeability question, but that's not how the defendants framed it and that's not the reason why the defendants wanted to introduce the evidence. Again, they never came back and said this is for as a defense to murder. This is to cut off our liability for murder. They kept coming back and saying this is to show the force, to show that we did not intend to kill him. So they argued that there wasn't intent to kill, showing the force used in the stab wounds, but they didn't argue, as I understand it, that the victim's volitional act was a supervening cause that would avoid proximate cause. That's correct, Your Honor. That's correct. But what was the basis for that proffer then? What was the reason that the attorney would say we would ask the coroner about the decedent pulling out the tooth? What would that proffer be for if not to show that there was an intervening cause? Again, Your Honor, I think as they summarized it at the sidebar, it was to show the intent that they did not intend to injure the victim with such a force or to stab the victim with such a force to kill him. Would it be fair to say that you're arguing the possibility is the cardiac arrest, regardless of how that arrest might have come about? Of course, Your Honor. I think any time you stab somebody, I mean, that was the position that we took. These defendants, Jose Maria stabbed this victim, pierced his lung, pierced his liver, and that was enough to show an intent to kill. This was not a case like the main case. That's a different case because in the main case, that's an involuntary manslaughter case. The jury doesn't have to find intent to kill, doesn't have to find the murder requisite. So in that case, as defense counsel pointed out, as the court pointed out, the defendant could have been liable for the involuntary manslaughter just because a bear had attacked the victim. But here the jury was given instructions on the murder instructions, and they were told that they had to find malice up for thought. And that's why in this case, it's different than having involuntary manslaughter where you don't have to find malice. Here, one of the elements is malice. The other question, Your Honor, that was raised is with regard to the conspiracy, and that's something we addressed. Conspiracy doesn't require, it just requires an agreement and an overt act. Those are the elements as the instructions. And in this case, the jury found the defendants guilty of the conspiracy. I notice you only have maybe a minute and a half. If I may, Your Honor. What about on the Brady issue? I'm sorry, the Brady issue, Your Honor. Let me be very clear, Your Honor. In this case, the jury was not left with the impression that there was no benefit to be given to Mr. Davis. Ryan Davis's own testimony is provided in our briefs. But was it misled in terms of when he possibly could get out? Your Honor, if I may. No, let me just say that, Your Honor. And I do want to just briefly direct the Court. These were not included in any of the excerpts. But they're the closing arguments of both defense counsel. And this is for Mr. Murillo and Mr. Rodriguez. I'll just simply cite the Pacer documents, document 857, starting at page 62. What day of the trial transcript is that? Your Honor, the date is not, let me just, this is on July 17th. And what page would that be, Pacer page? Page 63, for example. 63. Okay. He got a promise, we'll take care of you, we'll make sure you're safe, and you might get an additional time cut. We're not going to make you any promise now. But that, for a guy like Cryon Davis, is as close as ever going to get to a guarantee. So it was argued by counsel at closing. The jury heard that he got one-third reduction in his sentence from his prior cooperation with the government. In this case, this case was remanded back to Judge Phillips, where the court reviewed not just the documents, the briefs, but all internal documentation, e-mails, internal memoranda that was between the government and counsel for Mr. Ryan, between the government attorneys down in California and Oregon. And Judge Phillips made a finding. There was no secret agreement. Your Honor, I think I have 47 seconds. Actually, you're over 47. I'm sorry. Could you wrap up, please? May I finish just a couple of minutes? May I go over a few? Go ahead. Judge Rosenthal? Yes. Could we let the government have a couple of minutes to make sure they cover this important point on abradiation? Absolutely. And then give a couple of minutes extra on the follow-up.  After the about. Okay. Thank you, Your Honor. And the jury was told repeatedly to be skeptical of Ryan Davis. Instructions 17 and 19. After he testified, Judge Phillips told them to be skeptical of him, that he may get a benefit as a result of his testimony right after his testimony. At the end of the trial, the jury was reminded of that. But my question, were they misled by the government's rebuttal argument? Your Honor, let me just say, let me just read that part and just clarify that. Here's what was said in rebuttal. There was some suggestion yesterday that Davis is really trying to get a deal in this case. And he testified, ladies and gentlemen, that's not disputed. That his projected release date from prison is January 2011. But he also told you, and this was on cross-examination, quote, so in large measure you owe the government your life in your view. End of quote. That's the question. And then it's quoting what Davis said. I don't know if I owe my life. I probably owe my safety at this point. I have a great gratitude that they took the seriousness of the situation and realized what danger I was putting myself in by cooperating with them. And I'm very grateful. The defendants are never going to forget that I testified against them. Your Honor. I'm not talking about that portion. I'm talking about the portion where your opponent says that the government, in the rebuttal closing argument of the jury, gave a time, a year, when he's going to get released. And then a short time later files a motion to get him out even earlier. Again, this is the portion, Your Honor, that was quoted by the defense counsel talking about what Ryan Davis had said about January 2011. Your Honors, looking back at this, certainly seeing the arguments that were made by the defense on appeal and with the benefit of four or five years of experience under my belt, I would not have made the argument the way I said it. I certainly would have also referred to the cooperation agreement in this case, to the jury instructions that was given to the jury. It certainly wasn't as clear as I would have liked it to be. But certainly when we look at the totality of what the jury was told by Ryan Davis, testifying that he wasn't expecting anything, but it's very common that people who cooperate get a reduction in his sentence. The jury instructions that were given by the court, and recited, and again, it's in the sealed excerpts of records, Your Honor, where the government back then believed that Ryan Davis testified truthfully. The government today still believes that Ryan Davis testified truthfully. There was no wink and a nod. Repeatedly he was told that there's no promise. There was a written agreement which we entered into, discuss substantial assistance, discuss the importance of testifying truthfully. Repeatedly in the FBI 302s that are in the sealed excerpts, he was told that before the grand jury, when he testified, he was also told that in that agreement, the entire agreement was put on the record. Counsel, when you were discussing the closing argument, were you talking about the government's closing argument or defense closing argument? Were you talking about the promises as close as he gets? That was the defense closing argument, Your Honor. The first part that I cited. Okay. All right. Any additional questions from the panel? All right. Thank you, Counsel. None here. Thank you. Okay. Four minutes for rebuttal. All right. Thank you, Your Honor. I'm going to try to make five points, if I may. One, I would ask the Court to please not refer to this as a medical negligence issue. It's a cause of death evidence, not medical negligence. And the reason it was framed that way is because the government below framed it that way when they made a preemptive motion to exclude it, and they said it was only evidence of medical negligence. But that's how it's framed in the briefs, though. No, gross medical negligence and proximate cause is how it's framed in the briefs.  I'm looking at the issues presented on page four. Did the district court's exclusion of exculpatory medical evidence regarding proximate cause violate appellant's Fifth and Sixth Amendment rights to present a defense? Counsel, let's assume the panel is deciding that you are arguing exclusion of medical evidence because without that, so what? You remove the breathing tube. There's some medical evidence to say that that contributed to his death, right? I'm just trying to frame the issue, Your Honor. That was the first point I'm making. The second point I'd like to make is you'll notice in the government's answer in brief they never address the breathing tube. I think in our open brief we discuss it on more than half the pages. It's our main argument. They never mention it once in their brief. This morning, an oral argument before Your Honor's, Mr. Raphael went about eight minutes into it before both Judge Rollinson and Judge Gould pressed him, and, Judge, you pressed him on the issue. So is your argument that his pulling out of the medical tube was part of the medical negligence? Medical evidence. Cause of death evidence, yes. And that's the key. That's the main argument we make. I see a difference between medical negligence and intervening acts of the defendant. Okay. That's why I want you to not call it medical evidence. We call it exculpatory medical evidence, not... Medical negligence. You sound sick. Evidence, Your Honor. Issue four. Sorry, issue one. Issue number one. Did the district court's exclusion of exculpatory medical evidence regarding proximate cause violate appellant's Fifth and Sixth Amendment rights to present a defense? I thought it said medical negligence. Okay. That's why I made it as my first point, because it's medical evidence. The second point I'd like to make is at multiple times my colleagues said the only thing defendants said was about this one proffer, that they never came forward with a proffer. They never put forward their expert. And there's a problem with this. At least the government finally, on prodding from the bench, got to page 448, which is exactly a proffer. After the medical coroner testified and after they tried to establish through the medical coroner that the cause of death was brain death and that there was what the complications were to explain sequelae, because the medical coroner did not testify he died from stab wounds. He died from sequelae of stab wounds, and they want to know what that meant, because it didn't mean he died from the stab wounds, which is why the coroner could not honestly testify to that. And then they said, well, fine, let me make a, here's what we would get through the medical testimony in this trial. While he was, in the course of his treatment, I'll just read the whole thing. There are complications that flowed from the stabbing of Mr. Scopazzi that I would elicit from the coroner. Mr. Scopazzi was first taken to Victor Valley Hospital. In the course of his treatment there, he was put on a breathing tube. While he was there, he pulled the breathing tube out, and he also had a sudden loss of blood. The combination of pulling the breathing tube out and the sudden loss of blood caused a cardiac arrest. In other words, his heart stopped and it stopped for 12 minutes. He was resuscitated. He was then taken next day to Arrowhead Regional Hospital Medical Center, and he had another cardiac arrest. That is, his heart stopped. He was resuscitated again. He had exploratory surgery with no repair done, and he also had a CT scan to determine brain function. The CT scan revealed that his brain had swelled because of the lack of oxygen to the brain as a result of having those two cardiac arrests. As a result of that, he didn't have any brain function. After a period of time, the doctors declared, because he didn't have the brain function, they declared him dead and they took him off life support. Counsel, you've exceeded your time by two minutes. Could you sum up, please? Let me rephrase that. I think that is a proper update. Ask the evidence to come in a district court excluded under a wrong theory of law. I think Judge Lamell makes the correct point that they opened the door because the sequelae of puncture wounds is misleading and they were entitled to explore a complication. But here's the problem. If they opened the door, why then didn't the defense seek reconsideration of the judge's ruling at that point and seek to have this evidence brought in? The proffer we just made was right after they opened the door and they asked to do that and the judge rejected it at that very moment. ER 448 to 452. I'd ask you to read 19 to 22 of the ERs. All right. One, as Your Honor, Judge Rawlinson pointed out, they were in opposition because the judge ruled this was excludable from the jury. The evidence wasn't coming in. You can't fault them for not bringing Dr. Morgan in then. Five, the wounds were not fatal. The evidence is ER 15. The coroner said his wounds were healed at the time he pulled out the tube. Those wounds didn't cause the brain function. And fifth, to Judge Lamell's original point on the conspiracy issue, there was a Pinkerton instruction in this case and the jury might well have found that there was conspiracy to fight, but because his death was a natural and foreseeable result of those fighting, they were all responsible for the death and that's why the reason for the death under Maine in bracket should have been committed to this jury as a fact question. It was a fact issue for the jury. They should have been allowed to present the evidence. Thank you, Counsel. Thank you, Your Honor. Two minutes for a subsequent rebuttal. And let the record reflect Judge Lamell in questioning his playing devil's advocate and not necessarily a final determiner on what he feels on that. All right. Thank you. All right, Counsel, two minutes. I just wanted to wrap up by saying that in closing argument, the government told the jury essentially that Ryan Davis was not getting out early. The government said, quote, there was some suggestion yesterday that Davis was really trying to get a deal in this case. And he testified, ladies and gentlemen, that's not disputed, and his projected release date from prison is January 2011. And then the government goes into, you know, he's testifying out of fear for his life. What's wrong with all that? I'm sorry? If that's all true at the time, what's wrong with that? But it is giving the jury the impression that this guy is not getting out early. If you were to come back and then say to the jury, but by the way, he'll be out of custody in a couple of weeks, the jury, I think, would be stunned. Certainly the defense attorneys would be. It is totally inconsistent. I just want to wrap up by saying, you know, Giglio came down in 1972, and since that time, prosecutors have tried to figure out ways to get around it, and this court has repeatedly shot that down. This is another example of winking and nodding, and it should not be allowed to go on. But again, the government doesn't know that even if it intended on filing that motion immediately after this trial, that the court was going to grant it. The jury was still informed that, you know, this is a possibility. And so even if the government said, well, he won't get out of jail until 2011, but the jury already knows that if they file this motion for reduction, that he could get out earlier. Wouldn't that be a fair assumption from the director? I think that what the prosecutor said in rebuttal argument is shouting down the defense argument that he's probably going to get out. The government is saying, hey, come on, that's not going to happen. We didn't promise this guy anything. So what's wrong with the government responding to that argument? Well, you know, if somebody were to say that, well, I just, as soon as the verdict came in, God, you know, I never thought about that. Maybe I should do something nice for this guy. I mean, come on. I think that that's what I'm trying to say here. And it's just simply not an afterthought. It was everybody's intention all along, and the jury was deceived. I mean, the jury knows what the court instructs, and what you lawyers say is not evidence in the case. And the evidence shows that there was this possibility. The jury – Regardless of what the lawyers might have felt. It may not be evidence, but the jury is simply believing what the prosecutor is saying, has to believe in the prosecutor's case. And the whole issue here is we may know how the game is played, but the jury doesn't know how the game is played. And I think that that's what's important. Thank you, counsel. Thank you. Thank you to all counsel. The case just argued is submitted for decision by the court. We are recessed until 9.30 a.m. tomorrow.
judges: Lemelle, Gould, Rawlinson